IN THE UNITED STATES DISTRICT COURT
FOR THE MIDDLE DISTRICT OF TENNESSEE
NASHVILLE DIVISION

| | | |
|---|---|---|
| LAURIE McKEE, | ) | |
| | ) | |
| Plaintiff, | ) | Case No. 3:09-0321 |
| | ) | Judge Knowles |
| v. | ) | |
| | ) | |
| STATE OF TENNESSEE, | ) | |
| | ) | |
| Defendant. | ) | |

## MEMORANDUM OPINION

### I. Introduction and Background

The parties have previously filed a "Consent of the Parties" to have a United States Magistrate Judge conduct any and all further proceedings including the entry of judgment in this action. Docket No. 4. Judge Haynes subsequently entered an Order providing that all further proceedings in this action "shall be conducted before Magistrate Judge Clifton Knowles." Docket No. 10.

Pending before the Court is Defendant's Motion for Partial Dismissal. Docket No. 8. In support of that Motion, Defendant has submitted an accompanying Memorandum of Law. Docket No. 9. Plaintiff has filed a Response (Docket No. 16), to which Defendant has filed a Reply (Docket No. 17).

Plaintiff filed her Complaint on April 3, 2009, alleging that she was subjected to a hostile work environment, discriminated against on the basis of her gender and race, retaliated against for "whistle-blowing," and terminated based on pretext, in violation of Title VII of the Civil

1

Rights Act of 1964 and 42 U.S.C. §1983. Docket No. 1. Plaintiff also averred that Defendant's management employees fabricated and placed false documentation in her personnel file when she appealed her termination. *Id.* Plaintiff also raised state law claims of negligent hiring, negligent supervision and negligent retention.

Plaintiff filed her Charge of Discrimination with the EEOC on November 8, 2007. Docket No. 1. On January 3, 2009, Plaintiff received her Dismissal and Notice of Right to Sue letter dated December 30, 2008. *Id.* As noted, Plaintiff filed this lawsuit on April 3, 2009. *Id.*

Plaintiff seeks: (1) "an order to the State of Tennessee to cease and desist its illegally discriminatory treatment of employees at Clover Bottom Development Center"; (2) compensatory damages of $300,000 "or such amount as the jury and the Court may determine"; (3) an award of "back pay, front pay, lost job benefits, preferential rights to jobs, and other equitable relief"; (4) punitive damages; (5) costs and expenses, including reasonable attorney fees; (6) pre and post judgment interest; and (7) "such other and further relief as the jury and the Court may deem proper and just." *Id.*

Defendant filed the instant Motion for Partial Dismissal and accompanying Memorandum on April 29, 2009. Docket Nos. 8-9. Defendant argues that Plaintiff's claims under § 1983 and Plaintiff's state law claims should be dismissed because: (1) Plaintiff's Complaint fails to state a claim upon which relief can be granted pursuant to Fed. R. Civ. P. 12(b)(6); (2) pursuant to Fed. R. Civ. P. 12(b)(1), this Court lacks subject matter jurisdiction over Plaintiff's state law claims because the State of Tennessee has Eleventh Amendment immunity and sovereign immunity; (3) some of Plaintiff's claims are time-barred under 42 U.S.C. § 2000e-5; and (4) Plaintiff cannot recover punitive damages under Title VII. *Id.*

Defendant argues that Plaintiff's § 1983 claims should be dismissed because Defendant, her former employer, is the State of Tennessee, and the law is well-settled that the state is not a person under § 1983. *Id., citing Will v. Michigan Dep't. Of State Police*, 491 U.S. 58 (1989). Defendant also argues that, because Tennessee has not waived its immunity, the Eleventh Amendment and/or the doctrine of soverign immunity bars liability for Plaintiff's pendent state law claims. *Id.* With regard to Plaintiff's allegations of sexual harassment in September 2006, Defendant argues that those claims are time-barred because Plaintiff did not file her EEOC Charge of Discrimination until November 8, 2007, well after the permitted three hundred (300) day filing requirement set forth in 42 U.S.C. § 2000e-5. *Id.* Plaintiff responds that her request for injunctive relief against the state under 42 U.S.C. § 1983 should stand because the State waived its immunity from suit when it entered into a "still-active and in-force Settlement Agreement regarding Clover Bottom Developmental Center." Docket No. 16, *referencing* the 2003 Settlement Agreement, filed in *People First of Tennessee, et al., v. Clover Bottom Developmental Center, et al.,* and *United States of America v. State of Tennessee, et al*, Case No. 3:95-1227, United States District Court for the Middle District of Tennessee, Nashville Division. Plaintiff acknowledges that § 1983 does not provide a means of securing monetary damages against the State, but argues that § 1983 can serve as a basis for injunctive relief against the State. Docket No. 16.

Plaintiff also responds that this Court has subject matter jurisdiction over her pendent state law claims because Tennessee has "made a narrow but clear declaration of intent to submit to federal jurisdiction." *Id.* Plaintiff acknowledges that generally, unless a state waives its immunity, a citizen cannot sue that state under state law in federal court, but argues that, because

3

the State entered into "a detailed, federal-court-ordered remedial scheme in regard to Clover Bottom Development Center and its resident citizen patients and state employees," Tennessee has waived its immunity such that this Court has subject matter jurisdiction. *Id., citing* Settlement Agreement*, People First, supra*.

With regard to her gender harassment claim, Plaintiff argues that her claim should be deemed timely based upon the doctrines of equitable estoppel and equitable tolling because of "the extreme delays intentionally caused by Clover Bottom and then by the EEOC's gross delays in its handling of her Charge." *Id.* Plaintiff concedes that the September 2006 attempted rape she suffered is time-barred, but she argues that that incident does not form the basis of her gender harassment claim. *Id.* Plaintiff contends that the basis of her gender harassment claim is the "detailed pattern and practice of repeated emotional and psychological sexual harassment that she continued to suffer during late 2006 and the first part of 2007 even after documenting and reporting such behavior." *Id.* Plaintiff avers that she continued to suffer harassment, illegal discrimination, and retaliation through the summer and fall of 2007, when "her employment termination administrative appeal was apparently intentionally slow-walked by the executive director of Clover Bottom and his staff." *Id.* Plaintiff avers that "the EEOC then compounded her misery by twice losing her file and finally issuing her a right to sue letter at the end of December 2008, which she received in early January 2009." *Id.*

Plaintiff does not oppose Defendant's Motion to dismiss her claim for punitive damages under Title VII. *Id.*

Defendant, in its Reply, argues that Plaintiff is not entitled to injunctive relief under §1983 because: (1) her claim for injunctive relief does not pertain to resident care, which was the

4

subject of the Settlement Agreement cited by Plaintiff; (2) Plaintiff lacks standing to raise a claim for injunctive relief pertaining to resident care; and (3) Plaintiff is no longer employed at Clover Bottom, so the Order for injunctive relief she seeks would not directly impact her case. Docket Entry No. 17. Defendant also replies that Plaintiff's argument that the state waived its Eleventh Amendment immunity pursuant to the Settlement Agreement is unavailing because her state law claims are for negligent hiring, promotion, and retention, and do not relate to resident care. *Id.* Defendant reiterates its position that Plaintiff's §1983 claims should be dismissed. *Id.*

Defendant further replies that, although Plaintiff argues in her Response that she suffered an ongoing pattern and practice of sexual harassment, no such allegation was raised in her Complaint, and no allegation of sexual harassment beyond September 2006 was averred. *Id.* With regard to Plaintiff's argument that the statute of limitations should be equitably tolled, Defendant replies that Plaintiff has failed to present any evidence demonstrating why she waited until November 2007 to file her EEOC charge. *Id.* Defendant also argues that it would be greatly prejudiced if the 2006 cause of action were permitted since the alleged wrongdoer and potential witnesses may no longer be employed at Clover Bottom, considering that three years have passed since the incident alleged. *Id.* Regarding Plaintiff's contention that her claim should be allowed to proceed on the basis of equitable estoppel, Defendant argues that, although Plaintiff avers that some action of Defendant prevented her from timely filing her EEOC charge, Plaintiff has failed to provide any detail regarding what those actions might have been. *Id.* Defendant reiterates its contention that Plaintiff's sexual harassment claim is time-barred and should be dismissed. *Id.*

## II. Facts[1]

Plaintiff was employed by the State of Tennessee as a Developmental Technician at the Clover Bottom Development Center beginning approximately May 16, 2005. Plaintiff worked third shift, and was often praised by her fellow technicians, supervisors, and nurses. She left, taking maternity leave, and returned to work in August 2006. Upon her return from maternity leave, Plaintiff was assigned to supervisor Nagib Faydalla. Mr. Faydalla "regularly shouted and screamed" at Plaintiff, and made statements to other employees that he hated women, whose "place is in the home." He noted that he especially hated white women since they were "infidels." Plaintiff was generally the only Caucasian female who worked third shift.

Mr. Faydalla would frequently yell at Plaintiff while she was conducting scheduled debriefings at the beginning of her shift, telling her to "get on [her] unit." Other third shift technicians were permitted to complete their debriefings, while Mr. Faydalla would threaten Plaintiff with being written up for insubordination if she did not immediately report to her unit. During her shift, Mr. Faydalla would regularly designate a line on the floor at the edge of the unit and dining room and instruct Plaintiff "not to cross this line." Staying on the other side of the designated line meant that Plaintiff could not use the restroom, get a drink of coffee or water, consult with a nurse if a resident had a medical need, or do assigned chores such as laundry, without first requesting permission from Mr. Faydalla.

Clover Bottom policy was that, once each hour, every Developmental Technician was to sign the census book for their residents to confirm each resident was accounted for. Mr.

---

[1] Unless otherwise noted, the following "facts" are derived from Plaintiff's Complaint. They will be taken as true for purposes of the instant Motion for Partial Dismissal.

Faydalla would bring the book to Plaintiff alone and demand that she sign the book for all residents, including those on the other side of the building, without allowing her to actually verify the presence or condition of the residents. Mr. Faydalla did so to ensure that Plaintiff alone would be held responsible and punished in the event that a resident wandered away, escaped, or was in medical distress.

Plaintiff complained to Unit Director, Willis Watkins, who confirmed that Plaintiff was not supposed to sign the census book for all residents. At that time, Plaintiff was pregnant and on light duty. She was not technically "on the floor" and was not allowed to take responsibility for the presence of residents in the unit. Unit Director Watkins informed Plaintiff that he would address her complaint with Mr. Faydalla. The next shift, Mr. Faydalla yelled to Plaintiff, "you are to fill out the census book for everyone on the hour, and if you don't, I'll write you up." (Underlining original.) Mr. Faydalla also made Plaintiff sign the census book before she took her meal break and upon her return.

Mr. Faydalla would watch and stare at Plaintiff during her meal break. He would also stand at a distance glaring and staring at her when she visited with Developmental Technicians from other units, only to interrupt and confront her to remind her of the policy that she could not go into another unit's building. African-American Developmental Technicians were permitted to visit fellow staff members in other units.

Many members of the third shift struggled with occasional drowsiness, and Plaintiff suffers from sleep apnea. It was common for shift members to speak with each other in order to help stay alert. Mr. Faydalla began forbidding any male Developmental Technicians from speaking to Plaintiff, which increased the likelihood that Plaintiff might have trouble staying

7

awake through her shift. On one instance when Plaintiff fell asleep during her shift, Mr. Faydalla attempted to punish Plaintiff alone for falling asleep, when other members of her unit had fallen asleep as well. On another instance, Mr. Faydalla insisted that another staff member sign an affidavit that Plaintiff had fallen asleep. That staff member refused to sign the affidavit, and was yelled at by Mr. Faydalla for refusing to do so. Mr. Faydalla then attempted to have a different staff member sign an affidavit that Plaintiff had fallen asleep. That staff member likewise refused to sign the affidavit, and Mr. Faydalla stormed off.

After two weeks of this behavior, Mr. Faydalla was verbally reprimanded, and Plaintiff was transferred from her preferred third shift to first shift.

On the morning of September 28, 2006, at approximately 3:00 a.m., Plaintiff was sexually assaulted and molested by a male employee in an isolated area where no witnesses were present.[2] Plaintiff reported the attack to Director of Human Resources, Mr. Donald Barrie. Mr. Barrie at first refused to take the report, insisting that it would be a "he said, she said" since Plaintiff did not have any witnesses. Upon Plaintiff's insistence, a report was filed. During the same meeting with Mr. Barrie, Plaintiff presented to him her hand-written report of the harassment and discrimination she felt she was suffering on account of her gender and race, which included a written "whistle-blower" statement regarding Mr. Faydalla's policy violations. After a brief investigation, Plaintiff's sexual molestation complaint was dismissed, and no action was taken except to warn Plaintiff that she and her molester "must not fraternize during working hours." Plaintiff received no response to her written complaint of discrimination and

---

[2] It is unclear to the Court why Plaintiff was working at 3:00 a.m., when she previously alleged that she had been transferred from her preferred third shift to first shift.

harassment, but Mr. Faydalla "heightened his abuse" of Plaintiff.

On October 6, 2006, Mr. Faydalla demanded that Plaintiff "leave her meal hour."[3] Plaintiff refused to do so. Mr. Faydalla insisted that he was "pulling [her] off [her] lunch." He then called fellow supervisor Winell Adams and demanded that Plaintiff come into his office to be written up for "staring at him." Plaintiff explained that she had looked at the clock, not stared at him. Mr. Faydalla threatened to write Plaintiff up for insubordination. From that point onward, in order to avoid being written up for insubordination, Plaintiff was required to avert her eyes downward or away whenever Mr. Faydalla was present.

One evening, building unit manager, "Ms. Pat," gave permission to Plaintiff to work third shift because that shift was short-staffed. When Mr. Faydalla learned that Plaintiff was present, he angrily shouted, "I AM YOUR ONE AND ONLY SUPERVISOR." (Capitalization in original.) He then ordered Plaintiff to clock out and leave. When Plaintiff attempted to use the telephone to notify the grounds supervisor that she was being ordered to leave and would no longer be on the schedule, Mr. Faydalla shouted, "I'M NOT GOING TO TELL YOU AGAIN. CLOCK OUT AND GO HOME AND GET OUT OF MY BUILDING BEFORE I CALL SECURITY." (Capitalization in original.) Plaintiff's departure at Mr. Faydalla's insistence created a staff shortage in the Stones building. To cover the staff shortage in the Stones building, the grounds operations supervisor shifted a Developmental Technician from Harpeth unit to Stones unit. When that technician learned that Mr Faydalla had sent Plaintiff home he/she "revolted and CBDC security was called to calm things down." Mr. Faydalla reported

---

[3] It is again unclear to the Court why Plaintiff was being supervised by Mr. Faydalla on October 6, 2006, when Plaintiff earlier alleged that she had been transferred from her preferred third shift to first shift.

9

that Plaintiff had verbally abused a resident, but Plaintiff was cleared of that charge.

On another occasion, Plaintiff was sitting in the unit, rubbing her neck and stretching, while another employee was sleeping on the couch during his/her lunch break. Mr. Faydalla allowed African-American employees to sleep on the unit during their meal break, but Plaintiff was singled out and often threatened with punishment. On this particular occasion, Mr. Faydalla accused Plaintiff, who was awake, of sleeping. The other employee woke up and reported to Mr. Faydalla that it was he/she who had been sleeping. Later that same night, Mr. Faydalla returned and again accused Plaintiff of sleeping. He singled her out to check her sleep data sheets. Mr. Faydalla then woke up the male co-workers who were sleeping and then sat at the entrance to the female unit, watching and staring at Plaintiff for the remainder of her shift. Mr. Faydalla twice that evening woke up the male Developmental Technicians, but never took disciplinary action against them for sleeping.

On another instance, Plaintiff came in, checked the residents in her unit, then received permission from the second shift supervisor to go to her car briefly during her thirty minute shift overlap. Mr. Faydalla began yelling that Plaintiff must not ever "under any circumstances take order [*sic*] from anyone else." Fellow employees became upset, with one saying, "That's it, I can't take this any more." That employee started crying and called the grounds supervisor to come to the Stones building to provide help. Mr. Faydalla went to the Harpeth building and returned with fellow supervisor, Winell Adams. Plaintiff and her entire team were punitively "inserviced," had to read the policy manual in fifteen minute intervals, and had to sign an acknowledgment page. Supervisor Adams instructed Plaintiff and her fellow team members that they were never to leave their unit unattended. Plaintiff told supervisor Adams that they had

10

done no such thing, but supervisor Adams did not listen.

On the night of February 16, 2007, Plaintiff fell asleep during her shift because she was sleep-deprived from caring from her infant daughter who had been experiencing seizures. She was written up for having fallen asleep while "caring on a 1:1 basis for a resident at physical or medical risk."

Plaintiff's employment was terminated on February 27, 2007. Plaintiff appealed her termination. Her appeal was denied at both the first and second stages. On April 27, 2007, at the third stage, Plaintiff met with Clover Bottom Chief Officer, Dr. Levi Harris, who informed Plaintiff that he would render his decision within fifteen days. Dr. Harris failed to do so, despite Plaintiff's weekly calls to his office and to upper management to obtain the hearing decision. Plaintiff was informed that Dr. Harris was busy and unavailable.

Plaintiff filed her Charge of Discrimination with the EEOC on November 8, 2007. The EEOC sent Defendant a Notice of Charge of Discrimination on November 14, 2007, which requested a position statement by December 10, 2007. Defendant hand-delivered its position statement to the EEOC on May 19, 2008. That position statement included false documentation pertaining to Plaintiff, which had apparently been fabricated by Clover Bottom managers and placed in her personnel file. Plaintiff contacted the EEOC weekly during the summer and fall of 2008, inquiring about the status of her case. Plaintiff was told that her file had been misplaced, and was asked not to call again because they would notify her when her file had been located and an action was going to be taken.

On Saturday, January 3, 2009, Plaintiff received her EEOC Right to Sue Letter, which was dated December 30, 2008. On March 4, 2009, counsel for Plaintiff faxed to the EEOC

office a written request for a copy of Plaintiff's EEOC file. Plaintiff's counsel confirmed receipt with its supervisory investigator. The EEOC agreed to provide Plaintiff's file, but was unable to make a copy of that file until March 30, 2009, when EEOC officials directed Plaintiff to come to the Nashville EEOC office and pick up her "8-volume-file" to deliver to her counsel. As instructed, Plaintiff went to the Nashville EEOC office on March 30, 2009, but she was given only a redacted copy of her EEOC file. In reviewing her file, Plaintiff discovered the existence of the fabricated documentation. The EEOC file also included copies of Mr. Faydalla's disciplinary records, which demonstrated that "he had a history of abusing and mistreating inmates, residents, and staff members in his control." Plaintiff thereby discovered for the first time on March 30, 2009 that Mr. Faydalla had been disciplined for policy violations.

### III. Analysis

Fed. R. Civ. P. 12(b)(1) provides that a complaint may be dismissed for lack of subject matter jurisdiction. When challenging a court's subject matter jurisdiction under Rule 12(b)(1), a defendant may either facially attack the plaintiff's complaint by testing the sufficiency of the pleading itself, or by arguing the existence or non-existence of facts that would deprive a court of subject matter jurisdiction. *See Smith v. Northwest Airlines, Inc.*, 141 F. Supp. 2d 936, 939-40 (W.D. Tenn. 2001) (citations omitted).

Fed. R. Civ. P. 12(b)(6) provides that a claim may be dismissed for failure to state a claim
upon which relief can be granted. In order to state a claim upon which relief can be granted, a complaint must contain either direct or inferential allegations respecting all material elements to sustain a recovery under some viable legal theory. *Mezibov v. Allen*, 411 F.3d 712, 716 (6th Cir.

12

2005). Conclusory allegations or legal conclusions masquerading as factual allegations will not suffice. *Id.* A complaint containing a statement of facts that merely creates a suspicion of a legally cognizable right of action is insufficient. *Bell Atlantic Corp. v. Twombly,* 127 S.Ct. 1955, 1965 (2007). The "[f]actual allegations must be enough to raise a right to relief above the speculative level"; they must "state a claim to relief that is plausible on its face." *Id.* At 1965, 1974. *See also, Ass'n of Cleveland Fire Fighters v. City of Cleveland*, 502 F.3d 545, 548 (6th Cir. 2007).

Moreover, the United States Supreme Court has recently addressed the appropriate standard that must be applied in considering a Motion to Dismiss for failure to state a claim. *See Ashcroft v. Iqbal*, 129 S. Ct. 1937, 137 L. Ed. 2d 868 (2009). The *Iqbal* Court stated in part as follows:

> Two working principles underlie our decision in *Twombly*. First, the tenet that a court must accept as true all of the allegations contained in a complaint is inapplicable to legal conclusions. Threadbare recitals of the elements of the cause of action, supported by mere conclusory statements, do not suffice . . . . Rule 8 marks a notable and generous departure from the hyper-technical, code-pleading regime of a prior error, but it does not unlock the doors of discovery for plaintiff armed with nothing more than conclusions. Second, only a complaint that states a plausible claim for relief survives a motion to dismiss . . . . Determining whether a complaint states a plausible claim for relief will, as the Court of Appeals observed, be a context-specific task that requires the reviewing court to draw on its judicial experience and common sense. . . . But where the well-pleaded facts do not permit the court to infer more than the mere possibility of misconduct, the complaint has alleged - but it has not "show[n]" - "that the pleader is entitled to relief."

129 S.Ct. at 1949-1950, 173 L. Ed. 2d at 884 (citations omitted).

As noted above, Plaintiff avers that she was subjected to a hostile work environment,

13

discriminated against on the basis of her gender and race, retaliated against for "whistle-blowing," and terminated based on pretext, in violation of Title VII of the Civil Rights Act of 1964 and 42 U.S.C. §1983. Docket No. 1. Plaintiff additionally asserts pendent state law claims of negligent hiring, negligent supervision, and negligent retention. *Id.* Plaintiff further contends that Defendant's management employees fabricated and placed false documentation in her personnel file when she appealed her termination. *Id.*

### A. Section 1983 Claims

To the extent that Plaintiff's claims are brought pursuant to 42 U.S.C. § 1983, that statute authorizes the imposition of liability against every "person" who, acting under color of state law, violates another person's federally protected rights.[4] *See* 42 U.S.C. § 1983. The law is well-settled that a state is not a "person" within the meaning of § 1983. *See, Will v. Michigan Dep't of State Police*, 491 U.S. 58, 71, (1989); *Clark v. Kentucky*, 229 F.Supp.2d 718, 722 (E.D. Ky. 2002).

Plaintiff concedes that the State of Tennessee is not a "person" subject to suit for damages under 42 U.S.C. § 1983, and that, accordingly, she cannot recover monetary damages under § 1983. She argues, however, that she is entitled to obtain the injunctive relief she seeks

---

[4] 42 U.S.C. § 1983 provides in pertinent part that:
> Every person who, under color of any statute, ordinance, regulation, custom, or usage, of any State or Territory or the District of Columbia, subjects, or causes to be subjected, any citizen of the United States or other person within the jurisdiction thereof to the deprivation of any rights, privileges, or immunities secured by the Constitution and laws, shall be liable to the party injured in an action at law, suit in equity, or other proper proceeding for redress...

14

under § 1983 because the state waived its sovereign immunity from suit when it entered into a "still-active and in-force Settlement Agreement regarding Clover Bottom Developmental Center." Docket Nos. 1, 16.

In this argument, however, Plaintiff confuses two separate and distinct issues. The issue of whether a state is a person under § 1983 has nothing directly to do with a state's sovereign immunity or a possible waiver thereof. If the State is not a person under § 1983, Plaintiff cannot state a prima facie case against it under that statute, regardless of whether the State may or may not have waived its sovereign immunity. *See Arizonans for Official English v. Arizona,* 520 U.S. 43, 69 (1977) ("The barrier was not, as the Ninth Circuit supposed, Eleventh Amendment immunity, which the State could waive. The stopper was that § 1983 creates no remedy against a State."); *Gean v. Hattaway*, 330 F.3d 758, 766 (6th Cir. 2003) (recognizing that even if the state's sovereign immunity had been properly waived, a § 1983 claim would not lie against an entity that was not a person under § 1983).

For example, in *Harper v. Colorado State Board of Land Commissioners,* 2007 WL 2430122 (10th Cir.), plaintiff argued that defendant had "waived" the argument that it was not a person under § 1983 because defendant had removed the action to federal court. The Court stated in part as follows:

> [Plaintiffs] maintain that "[t]he reason a state agency (or a state itself) is generally not a 'person' for purposes of a suit for damages under [§ 1983] is because of the 11th Amendment . . . ., which immunizes states from federal court suits for damages." . . .
>
> This argument is not persuasive. The Supreme Court has recognized a distinction between the immunity afforded by the Eleventh Amendment and the limitations in the scope of § 1983 arising from the terms of the statute.

15

2007 WL 2430122 at **4, *citing Arizonans for Official English, supra*.

For these reasons, Plaintiff cannot sustain her §1983 claims against the State, whether for damages or for injunctive relief, even if the State had waived its sovereign immunity. Defendant's Motion to Dismiss Plaintiff's §1983 claims will be granted.

### B. State Law Claims

Plaintiff also raises claims under state law for negligent hiring, negligent supervision, and negligent retention. Docket Nos. 1,16. Defendant argues that Plaintiff cannot sustain her state law claims, because they are barred by the Eleventh Amendment and/or the doctrine of sovereign immunity. Docket Nos. 8, 17.

The Eleventh Amendment states:

> The Judicial power of the United States shall not be construed to extend to any suit in law or equity, commenced or prosecuted against one of the United States by Citizens of another State, or by Citizens or Subjects of any Foreign State.

U.S. Const. amend. XI.

The Supreme Court has construed the Eleventh Amendment to also bar actions by citizens against their own state, state agencies or instrumentalities, or, in some cases, state officials in federal court. *See Edelman v. Jordan*, 415 U.S. 651 (1974); *Pennhurst State Sch. & Hosp. v. Halderman,* 465 U.S. 89 (1999). Moreover, the Court has recognized that the "sovereign immunity" of the States is a concept "inherent" in the Constitution and that it is not limited by the language of the Eleventh Amendment. *See Alden v. Maine*, 527 U.S. 706, 728-29.

When an individual seeks to sue a state, there are two possible ways that a sovereign immunity defense can be overcome. First, Congress can abrogate a state's sovereign immunity by passing appropriate legislation pursuant to Section 5 of the Fourteenth Amendment. *See*

16

*Hoffman v. Connecticut Dep't of Income Maintenance*, 492 U.S. 96 (1989).  Second, a state may waive its immunity from suit.  *See Halderman, supra,* 465 U.S. at 99-100.

Plaintiff concedes that generally a citizen cannot sue a state under state law in federal court, but argues that the State waived its immunity "through a detailed, federal-court-order remedial scheme in regard to Clover Bottom Developmental Center and its resident citizen patients and state employees."  Docket No. 16, p. 5.  Plaintiff refers to a Settlement Agreement filed in *People First v. The Clover Bottom Development Center*, Case No. 3:95-1227, United States District Court for the Middle District of Tennessee.

Although Plaintiff relies upon this Settlement Agreement as authority for her argument, she has failed to file a copy of that Settlement Agreement.  The only specific language from the Settlement Agreement Plaintiff cites is as follows:

> Such Settlement Agreement specifically states, at page 52, that a "state employee may not be precluded or discouraged from exercising his or her rights under the First Amendment to the Constitution of the United States."  Further, at page 63, the State specifically agreed, in entering into such Settlement Agreement, that "[t]he Court shall retain jurisdiction of this action <u>for all purposes</u> under this Agreement [emphasis supplied] until this Action is dismissed."
>
> Plaintiff McKee reported abuse, neglect, and mistreatment of resident citizen patients, and for that she was subject to a pattern and practice of harassment, cruelty, and abuse.  The Settlement Agreement . . . specifically contemplates the importance of addressing and correcting such abuse, neglect and mistreatment, and requires as follows:
>
>> All direct care staff will be trained to appropriately supervise citizens in order to reduce abuse, neglect and mistreatment.  All direct care staff will be trained to recognize and report abuse, neglect and mistreatment.

17

> Settlement Agreement, p. 51.
>
> The fact that the Settlement Agreement . . . addressed the same sort of violation of individual liberties and civil rights further establishes that the State has consented, in regard to this particular "arm of the State" known as Clover Bottom Developmental Center, to allow future remedial actions to be brought against the State in this Court.

Docket No. 16, p. 3-4.

As Defendant correctly argues, the test for determining whether a State has waived its immunity for the suit in federal court is a stringent one. *College Savings Bank v. Florida Prepaid Postsecondary Ed. Expense Bd.,* 527 U.S. 666, 676 (1999). In order to prevail on her waiver argument, Plaintiff would have to show a "clear declaration" of the State's intent to submit to jurisdiction in this Court. 527 U.S. at 676. *Halderman*, *supra,* 465 U.S. at 99 (A state's intent to waive Eleventh Amendment immunity must be "unequivocally expressed."). As the Supreme Court stated in *College Savings Bank,* "the whole point of requiring a 'clear declaration' by the State of its waiver is to be certain that the State in fact consents to suit." 527 U.S. at 680.

The Court cannot accept Plaintiff's argument that the Settlement Agreement is a clear declaration that the State has waived its sovereign immunity in actions brought by employees of the State under State law. Plaintiff has not met her burden of establishing that the State has waived its sovereign immunity. Accordingly, Defendant's Motion to Dismiss Plaintiff's state law claims of negligent hiring, negligent supervision, and negligent retention will be granted.

### C. Title VII Claims

In the instant Motion itself, Defendant makes broad statements that the statute of limitations has expired and that the Complaint fails to demonstrate compliance with 42 U.S.C. §

18

2000e-5. Docket No. 8. In its supporting Memorandum, however, the only specific argument Defendant makes with regard to these issues is an argument that alleged sexual harassment in September 2006 is barred by the statute of limitations. Docket No. 9, p. 5-6.

Plaintiff's Complaint is generally devoid of any allegations as to when most of the conduct of which she complains occurred. She does refer to an incident that occurred on September 28, 2006, at approximately 3:00 a.m., when she was "assaulted and molested" in an isolated area where no witnesses were present by a male employee who worked in an adjacent building. Docket No. 1, p. 7. Insofar as the undersigned can determine, this is the only specific reference in the Complaint to anything that occurred in September 2006.

As discussed above, Plaintiff has conceded that the claims related to the attempted rape incident she suffered in September 2006 are "outside the time limit bounds . . . ." Docket No. 16, p. 6. Therefore, Defendant's Motion to Dismiss Plaintiff's Title VII claims regarding the alleged attempted rape and/or sexual assault that occurred in September 2006 will be granted.

### D. Punitive Damages

While Defendant's Motion itself does not raise this point, Defendant has argued in its supporting Memorandum that Title VII does not permit the recovery of punitive damages against a governmental entity. Docket No. 9, p. 6. In her Response, Plaintiff states that she opposes Defendant's Motion, "except as to the State's Motion to Dismiss the claim for punitive damages under Title VII." Therefore, Plaintiff's claims for punitive damages under Title VII will be dismissed.

19

An appropriate Order will be entered.

_____
E. Clifton Knowles
United States Magistrate Judge